State, ex rel. Spillman, v. Security State Bank.

STATE, EX REL. O. S. SPILLMAN, ATTORNEY GENERAL, APPEL-
LEE, V. SECURITY STATE BANK OF EDDYVILLE, APPELLEE:
COMMONWEALTH LIFE INSURANCE COMPANY, CLAIMANT,
APPELLANT.

FILED JUNE 9, 1927.   No. 25096.

Banks and Banking:  GUARANTY FUND:  "DEPOSITS."  Where money
    purporting to be a deposit is placed in a state bank, for which
    the bank issues and delivers to the purported depositor certif-
    icates of deposit in terms providing for payment of 5 per cent.
    annual interest, and where, by an understanding between the
    parties, the bank pays to such person a bonus above the lawful
    rate of 5 per cent. interest, *held* that such transaction does not
    constitute a deposit within the meaning of the bank depositors'
    guaranty act, but is a mere loan of money to the bank.  Comp.
    St. 1922, sec. 8008.

APPEAL from the district court for Dawson county: ISAAC
J. NISLEY, JUDGE.  *Affirmed.*

*Jackson B. Chase,* for appellant.

*Horth, Cleary & Suhr* and *C. M. Skiles, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD,
THOMPSON and EBERLY, JJ.

DEAN, J.

The district court for Dawson county disallowed a certain
claim of the Commonwealth Life Insurance Company, here-
inafter called claimant, against the depositors' guaranty
fund for $5,351.86, with 5 per cent. yearly interest, from
January 1, 1923, for money deposited by claimant in the
lately failed Security State Bank of Eddyville, hereinafter

called the bank. From this disallowance of its claim an appeal has been prosecuted by claimant.

It appears that there was an arrangement between the claimant and the bank by which assistance was to be rendered by the bank's officers to the claimant's agents, in the Eddyville vicinity, to procure life insurance for claimant and, in consideration of such assistance, the claimant was to maintain certain of its deposits in the bank.

In behalf of the state the attorney general argues that, during the period in which the transactions happened out of which the claim arose, there was a "fraudulent agreement between the officers of the bank and the officers of the insurance company for interest in excess of 5 per cent., by reason whereof the funds left with the bank constituted a loan and not a deposit." And the district court so found and decreed by its judgment. While the claim was allowed as a general claim against the receiver of the bank, the claimant was not, of course, reimbursed from the depositors' guaranty fund. Hence this suit.

George C. Gage was a bank examining agent for the bank receiver and he testified that the bank records disclosed that a bank certificate of deposit for $500, dated on or about April 30, 1921, was issued to claimant, and that, under the same date, an expense item of $3.75 was charged to the bank in suit, and that this $3.75 item represented excess interest which was paid by the bank to claimant for the deposit. He testified that the bank records showed other like instances. In corroboration of his statement the witness produced a letter from M. Goldsmith, claimant's agent, written on claimant's letterhead, to the cashier of the bank. The letter follows:

"April 30th (1921).

"Mr. Robert O'Meara, Security State Bank,

"Eddyville, Nebr.

"Dear Friend Bob: Attached please find check for $500 for which please send the company a C-D bearing 5% and a draft for the additional interest $3.75. Mr. Parker promised me another $500 at least next week and I will

send it then.    Trusting this will meet with your approval and I will get the rest as fast as possible.

"Yours truly,

"(Signed) Milton Goldsmith."

Gage also testified that another certificate of deposit for $1,000, dated March 14, 1921, was issued to claimant and, under the same date, an expense item of $7.50 was charged to the bank, and this $7.50 item represented excess interest paid by the bank for the deposit.    In this he was corroborated by a letter from Goldsmith to the cashier of the bank.    The letter follows:

"March 14th, 1921.

"Mr. Robert O'Meara, Security State Bank,

"Eddyville, Nebr.

"Dear Friend:    On your business mailed into the office for which I thank you I notice that you have made an error on two of the applications and I enclose them for you to make the corrections.    Frank Duggins, age 34, rate $39.84, and you charged him the disability twice and you will please refund him $1.78 as the disability is included in the rate book at the stated age.    James C. O'Meara, age 32, rate $38.33, and you charged him at age 35 also charging him the disability twice and you will see that his rate should be $38.33 so you will please refund him the difference between $40.65 and $38.33 which is $2.32 plus $1.72 which is the disability charged twice making a total refund to him of $4.04.

"I am also enclosing our draft No. 36785 for $1,000 and you will please send in a C/D for $1,000 at 5 per cent. and a draft for $7.50 making the interest 6½ per cent. as per our arrangement.    I will see you a week from today and trust that you will have a nice line for me to work on. Again thanking you for the business written this week I beg to remain,

"Yours truly,

"(Signed) M. Goldsmith, District Agent."

Robert O'Meara, cashier of the bank, testified that Gold-

smith was the first man with whom arrangements were made whereby he, the cashier, was to write insurance for claimant on a commission basis, and that the arrangement was that claimant would deposit the money received for insurance premiums and that it was to be left in the bank. But he testified that some of this money was sent to the bank from Omaha and some was deposited personally by Goldsmith. But it is contended that Goldsmith was not an authorized agent of the claimant. Mr. Uehling, however, former president of the Commonwealth Life Insurance Company, testified that any business relations between the Commonwealth and the bank might have been instigated by Goldsmith, and that after Goldsmith had made some overtures and negotiated some business it was taken up with the Omaha office. He denied that there was any agreement made with the bank by which they were to receive more than 5 per cent. interest, but, apparently on reflection on this point, Mr. Uehling testified: "Q. There might have been, however, Mr. Uehling, without your knowledge? A. There might have been; yes, sir."

Counsel for the bank, on page 49 of his brief, argues: "Even though by some strange process of reasoning this alleged excess interest agreement upon which the receiver so confidently relies could be considered in force down to the closing of the bank, such fact would not change the rights of this claimant in the slightest particular. Because the evidence shows that no excess interest was paid after June, 1921, and said section (8008) prohibits the paying of excess interest and not the mere request or agreement for excess interest." But the letter written by Goldsmith to the cashier of the bank, "after June, 1921," appears to bear directly on the facts before us and it is apparently inconsistent with the argument of counsel. The letter follows:

"February 2d, 1922.

"Mr. Robert O'Meara,
"Eddyville, Nebr.
"Dear Bob: Your letter of the 1st at hand and con-

tents noted and I did not write to you to try and make you sore or anything of that nature but to try and get you to see the position the company is in when they make deposits with banks. The company does not want any bank to use any of their own funds to finance our premium notes and they want to deposit with each bank an equal amount of money for each note taken and they are willing to do that. Now in regard to the deposit out there which is more than what the notes amount to. I did not threaten to draw this money but I did say that the company was liable to draw it and would not feel that they should renew it all. We aim to do business on the square and will do it that way or not at all and the company will keep on adding to your deposit as we do business and as you stated there is business to be had out there and I would like to come out and work with you and place in your bank a cash deposit of equal amount for the notes taken. It is true that the business we have written out there will need some attention and we surely want you to attend to it and want to keep on such terms with you and your bank that you will be glad to do it and we can do enough business out there to make this deposit reach the $10,000 mark if you will work with me.

"Please wire me at my expense if you will work with me out there next week and the notes taken will be offset by a cash deposit from the company. I am having Mr. Uehling sign this letter also so that you will know the company is aware of the promise I am making you. Hoping to receive this wire not later than tomorrow, I beg to remain,

"Yours very truly,
"(Signed) F. J. Uehling, President.
"(Signed) M. Goldsmith, District Agent."

It will be noted that in the above letter of February 2, 1922, Mr. Goldsmith was the intermediate agent, the go-between, in making the unlawful arrangements with the bank for excess interest, and he wrote to the cashier of

the bank, O'Meara, to assure him, as such official, that he does not want to make him "sore or anything," but only wanted to get the cashier "to see the position the company is in when they make deposits with banks" and that claimant wanted to keep on such terms with the bank as would be profitable to both. And this letter, in token of its verity, as having been inspired by the claimant, is countersigned by F. J. Uehling, its president.

Mr. J. R. Paisley, president of the International Life Insurance Company, succeeded Mr. Uehling as president of the claimant company in January, 1923, and from his evidence, on defendant's part, it appears that there was a consolidation of the claimant company with the Standard Life Insurance Company, and "a subsequent merger into the International Life Insurance Company," whereby the International acquired all of the assets of the Standard, "including the claim against the Eddyville bank." He denied that excess interest or a bonus over 5 per cent. on deposits was ever received by claimant to his knowledge "unless it was by some error in the accounting," and that no fraudulent agreement was entered into between the company and the bank while he was its president, nor prior to that time, "that we have any record or knowledge of." On this feature of the case Mr. Paisley testified that he had it in mind that it was not advisable to make any deposits in Nebraska banks "on a collateral agreement (because they) would not be entitled to payment out of the guaranty fund." The evidence of this witness was somewhat evasive and mostly negative in character.

Robert O'Meara was not only an unwilling witness, but he was positively hostile in his attitude toward the state. In respect of the time and the facts surrounding the transactions, in regard to the payment of excess interest on the $500 deposit and the $1,000 deposit and the relations of the bank with the claimant generally, his evidence follows: "And you wrote them a C. D. for $1,007.50, didn't you? A. If the records show that I did; yes. Q. And on the same day you charged $7.50 to the expense account of the bank,

State, ex rel. Spillman, v. Security State Bank.

didn't you?  A. Probably did. * * * Q. What does it say there,—well, it is charged to expenses, isn't it?  A. Yes; but it is interest on deposit; that isn't concealing anything, is it?  Q. Is that the expense account there?  A. That's the expense account right there.  Q. And did you charge interest to expense?  A. Yes, sir.  Q. You do?  A. Yes; sir.  Q. And when you issued them a cashier's check for $3.75, what' did you charge that to?  A. Charged it to expense.  Q. And when you charged $100 attorney's fees to expenses, what was that for?  A. That's expenses.  Q. What expense,—what attorney did you pay it to? * * * Q. You resent the inference that you have charged certain things to something other than for what they were paid, don't you, Mr. O'Meara?  A. No, sir.  Q. You did charge the bank with $100 attorney's fees?  A. Yes, sir.  Q. And that was commission, wasn't it?  A. No, sir.  Q. What attorney was it paid to?  A. I don't know.  Q. It wasn't paid to any attorney?  A. It was paid to Joe Mutchie.  Q. Is he an attorney?  A. I don't know whether he is or not.  Q. You know he isn't, don't you?  A. He is no attorney.  Q. Then, why did you charge it to attorney's fees?  (no answer.)" On the cross-examination, he further testified: "Q. Now, you say that when you first commenced doing business with Goldsmith he and you entered into an agreement whereby your bank was to pay a bonus of 1½ per cent. on certain moneys placed in the bank on time deposit?  A. Yes, sir. Q. Was that agreement for that bonus entered into with Goldsmith?  A. Yes, sir. * * * Q. What was your understanding as to who was to get this bonus?  A. Well, I didn't really know who was to get it, I put it in the time certificates and he (Goldsmith) took the certificates with him, I don't know who was to get it, whether he got it or whether the company got it.  Q. But your agreement was with him, was it?  A. Yes.  Q. That you would pay a bonus?  A. Yes. Q. Did he ask you to put it in the certificate?  A. Yes; he asked me to put it in the certificate.  Q. Now, as a matter of fact, the bonus was paid sometimes by cashier's check?  A. I suppose it was."

Elsewhere in his cross-examination, O'Meara, who was the defendant's leading witness, testified that the account herein, from its beginning until its close, "figured out 4¾ per cent." But this evidence is not borne out by the record and is so at variance with other evidence of this witness that it is not entitled to credence.

Where money purporting to be a deposit is placed in a state bank, for which the bank issues and delivers to the purported depositor certificates of deposit in terms providing for payment of 5 per cent. annual interest, and where, by an understanding between the parties, the bank pays to such person a bonus above the lawful rate of 5 per cent. interest, such transaction does not constitute a deposit within the meaning of the bank depositors' guaranty act, but is a mere loan of money to the bank. Comp. St. 1922, sec. 8008; *Iams v. Farmers State Bank,* 101 Neb. 778.

The state cites section 39, ch. 191, Laws 1923, which became effective April 7, 1923. The claimant contends that to apply this act to the facts before us would give it a retroactive effect. But we do not find it necessary to invoke section 39 in the decision of the present case, hence we do not decide the objection interposed by counsel. We have repeatedly held that cases which involve an interpretation of the depositors' guaranty law appear to be such that each case must, in large part at least, be determined by the facts surrounding the individual case. And in the present case it seems clearly to appear that the law in question was violated, and that the judgment of the trial court is without reversible error. The judgment is therefore

AFFIRMED.